IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
PINE BLUFF DIVISION

**WINSTON HOLLOWAY**                                                                        **PLAINTIFF**
**ADC #67507**

v.                                 **No: 5:17-cv-00217 JM-PSH**

**JIMMY PHILLIPS**                                                                 **DEFENDANT**

## PROPOSED FINDINGS AND RECOMMENDATION

### INSTRUCTIONS

The following Recommendation has been sent to United States District Judge James M. Moody Jr. You may file written objections to all or part of this Recommendation. If you do so, those objections must: (1) specifically explain the factual and/or legal basis for your objection, and (2) be received by the Clerk of this Court within fourteen (14) days of this Recommendation. By not objecting, you may waive the right to appeal questions of fact.

### DISPOSITION

### I. Introduction

Plaintiff Winston Holloway, an inmate at the Varner Unit of the Arkansas Department of Correction (ADC), filed a *pro se* complaint pursuant to 42 U.S.C. § 1983 on August 21, 2017, alleging that his constitutional rights were violated during a strip search at the Varner Unit on May 31, 2017. Doc. No. 2 at 6-14. Holloway's unreasonable search claim against defendants Captain Jimmy Phillips, Lieutenant Brandon James, and Assistant Warden Antwon Emsweller was allowed to proceed, while his other claims were dismissed without prejudice for failure to state a claim upon which relief may be granted. *See* Doc. Nos. 5 & 8. All defendants other than Phillips were

later dismissed after the Court determined that Holloway had not exhausted available administrative remedies with respect to those defendants. *See* Doc. Nos. 48 & 50. Holloway seeks monetary and injunctive relief from Phillips in both his official and personal capacities. Doc. No. 2 at 5, 10 & 13.

Before the Court is a motion for summary judgment and related pleadings filed by Phillips (Doc. Nos. 61-63). Holloway filed responsive pleadings (Doc. Nos. 65-67), and the motion is ripe for disposition. For the reasons described below, the undersigned recommends that Phillips' motion for summary judgment be granted.

## II. Legal Standard

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a); *Celotex v. Catrett*, 477 U.S. 317, 321 (1986). When ruling on a motion for summary judgment, the court must view the evidence in a light most favorable to the nonmoving party. *Naucke v. City of Park Hills*, 284 F.3d 923, 927 (8th Cir. 2002). The nonmoving party may not rely on allegations or denials, but must demonstrate the existence of specific facts that create a genuine issue for trial. *Mann v. Yarnell*, 497 F.3d 822, 825 (8th Cir. 2007). The nonmoving party's allegations must be supported by sufficient probative evidence that would permit a finding in his favor on more than mere speculation, conjecture, or fantasy. *Id.* (citations omitted). An assertion that a fact cannot be disputed or is genuinely disputed must be supported by materials in the record such as "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . .". FED. R. CIV. P. 56(c)(1)(A). A party may also show that a fact is disputed or undisputed by "showing that the

materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case. *Othman v. City of Country Club Hills*, 671 F.3d 672, 675 (8th Cir. 2012). Disputes that are not genuine or that are about facts that are not material will not preclude summary judgment. *Sitzes v. City of West Memphis, Ark.*, 606 F.3d 461, 465 (8th Cir. 2010).

### III. Facts[1]

In late May 2017, Varner Unit officials received information that there was a gun in 21 barracks where Holloway was housed. Doc. No. 69, *March 22, 2019 Deposition Testimony of Winston Holloway*, at 9; Doc. No. 61-2, *Declaration of Jimmy Phillips*, at ¶ 5. Based on this information, searches of 21 barracks were conducted on May 30 and May 31, 2017. Doc. No. 69 at 9.[2] The inmates housed in 21 barracks, including Holloway, were also strip searched on May 31, 2017. Doc. No. 61-2 at ¶ 5; Doc. No. 61-3, *Declaration of Antwon Emsweller,* at ¶ 8; Doc. No. 61-6, *Declaration of James Gibson,* at ¶ 6.

Holloway alleges that a couple of days before May 30, 2017, an inmate in the barracks who owed drug debts saw another inmate get beaten because the inmate had not paid his debts. Doc. No. 69 at 9; Doc. No. 2 at 8. After witnessing this beating, the inmate became scared, called his grandmother, and told her that the inmates in the barracks had a gun and were going to shoot him.

---

[1] The facts are taken from Phillips' statement of facts (Doc. No. 63) and supporting documents. Disputed facts are noted.

[2] Holloway's claims relating to the May 30, 2017 search were previously dismissed. Doc. Nos. 48 & 50.

3

*Id.* Holloway states that the inmate's grandmother called ADC officials and reported that there was a gun in 21 barracks. Doc. No. 69 at 9; Doc. No. 2 at 8.

Holloway testified that Captain Jimmy Phillips entered 21 barracks with his officers on May 31, 2017 and ordered the inmates to line up.[3] Doc. No. 69 at 10. After the inmates lined up, Phillips ordered the inmates to go one at a time into the hallway between 21 and 22 barracks. Doc. No. 69 at 10; Doc. No. 2 at 6. In the hallway, each of the inmates was stripped and searched. Doc. No. 69 at 10-11; Doc. No. 2 at 6. Phillips did not search Holloway or any of the inmates. Doc. No. 69 at 18; Doc. No. 61-2 at ¶ 7. He ordered the searches and supervised the field staff while they performed the searches. *Id.*

During his deposition, Holloway testified that at least 25 inmates were in the hallway naked and strip searched at the same time. Doc. No. 69 at 13 & 16. According to Holloway's complaint, 50 inmates in 22 barracks watched through the barracks window as each of the inmates from 21 barracks stripped and underwent visual body cavity inspections. Doc. No. 2 at 6. He testified in his deposition, however, that 150 inmates in 19, 20, and 22 barracks observed the searches through the windows of their respective barracks. Doc. No. 69 at 19. Holloway also claims that the searches were in sight of the female correctional officers assigned to work in 17, 18, 19, 20, 21, and 22 barracks who were standing in the hallway during the search. Doc. No. 2 at 6; Doc. No. 69 at 18. Holloway described the females who could see the search in his deposition testimony:

> The female guard on our barracks that day was standing in the hallway because she said something to me after we were dressed again. . . .
>
> [The same guard] was over the barracks at that time. They have a guard station on each side of the hallway for two different barracks, but they only have one guard down there assigned to do it. But there's a sergeant that roams, and that would be a female too. Then the lady at the store that runs the commissary, which

---

[3] During all times relevant to this lawsuit, Phillips was a field captain at the Varner Unit. Doc. No. 61-2 at ¶ 2; Doc. No. 61-3 at ¶ 5; Doc. No. 61-6 at ¶ 5. His job duties included overseeing all field operations, supervising all field staff, and reporting to the unit's warden and deputy wardens. Doc. No. 61-2 at ¶ 3.

4

is right up the hall. The next set of barracks up the hall, there are females that run those. They pretty well keep the females back there.

Then there were other ones that would come down the hallway and look and see what was going on and then go back. That includes male and female.

*Id.* at 18-19.

Holloway complains about the location of and the manner in which the May 31, 2017 strip searches were conducted. Doc. No. 69 at 20. He testified that ADC personnel normally conduct strip searches by taking one or two inmates at a time into a bathroom. *Id.* at 17.

Holloway described how he was searched on May 31 as follows:

You stand there, and the guard is standing here. He watches everything. You have to take off all your clothes. He goes through all your clothes while you're standing there naked. Then he throws those to the side. Then you have to raise your arms, open your mouth, and they look in your mouth and all of that, hair and whatever. Then you have to lift your genitals, and then you have to turn around and bend over and squat and cough. Then you're back up and he allows you to put your clothes back on.

*Id.* He explained that the officer did not touch him during the search. *Id.*

Holloway asserts that he and the other inmates were not afforded any dignity during the May 31, 2017 searches, and there was no attempt to minimize their embarrassment. *Id.* at 20-21. Holloway believes that the strip searches should have been conducted out of the sight of female correctional officers and should have taken place in a bathroom or shower area. Doc. No. 69 at 21-22. Holloway acknowledges that ADC policy does not require inmate strip searches to be conducted in a bathroom. Doc. No. 69 at 22.

The ADC and Varner Unit have policies pertaining to searches of inmates, unit searches and control of contraband. Doc. No. 61-3 at ¶ 9. The policies in effect during May 2017 were Administrative Directive 11-24 (AD 11-24) and Varner Unit Policy 09.8.0 (VU 09.8.0). The Varner Unit policy mirrors AD 11-24. *Id.*; Doc. No. 61-4, *Administrative Directive 11-24*; Doc.

No. 61-5, *Varner Unit Policy VU 09.8.0*; Doc. No. 61-6 at ¶ 7. The policies define a strip search as "an unclothed body search, which requires the person to remove his or her clothing in conformance with approved procedures and professional practices." Doc. No. 61-3 at ¶ 13; Doc. No. 61-4 at § III(D); Doc. No. 61-5 at § IV (E); Doc. No. 61-3 at ¶ 11. Pursuant to Varner Unit Policy VU 09.8.0, inmate searches are to be conducted for the following reasons: (1) to detect and suppress the introduction of contraband into the unit; (2) to recover missing or stolen property; or (3) to prevent escapes or other disturbances. Doc. No. 61-3 at ¶ 10; Doc. No. 61-5 at § V (C); Doc. No. 61-6 at ¶ 8. AD 11-24 and VU 09.8.0 both explain that inmate searches may be conducted as often as necessary to control contraband, but may never be conducted for purposes of punishment or harassment. Doc. No. 61-3 at ¶ 11; Doc. No. 61-4 at § VI(B); Doc. No. 61-5 at § V(E); Doc. No. 61-6 at ¶ 9. The policies also require a strip search to be conducted in a professional manner by staff of the same gender as the inmate, except in cases of emergency. Doc. No. 61-3 at ¶ 12; Doc. No. 61-4 at § IV(B)(4)(b); Doc. No. 61-5 at § V(E)(4)(b); Doc. No. 61-6 at ¶ 10. The policies further explain that a strip search does not require reasonable suspicion that the individual is concealing contraband. *Id.*

In an affidavit filed as an exhibit to his motion for summary judgment, Phillips testified that Varner Unit Superintendent James Gibson advised him on May 31, 2017 that a gun had been reported in 21 barracks. Doc. No. 61-2 at ¶ 5. He explained that Superintendent Gibson ordered him to move the inmates assigned to 21 barracks into the hallway for strip searches. *Id.* Phillips conceded that strip searches are ordinarily performed in the bathroom area. Doc. No. 61-2 at ¶ 6. Because this was an emergency situation,[4] however, the superintendent ordered the inmates to be

---

[4] Holloway disputes there was an emergency because the barracks had already been searched. Doc. No. 66 at 2; Doc. No. 67 at 2.

strip searched in the hallway to prevent them from passing the gun from one to another in order to avoid its discovery.  Doc. No. 61-2 at ¶ 6.  Phillips did not remember any female officers being present during the search.[5]  Doc. No. 61-2 at ¶ 8.

Antwon Emsweller was a Deputy Warden at the Varner Unit in May 2017, and Phillips worked under his supervision.  Doc. No. 61-3 at ¶¶ 5 & 8.  Emsweller testified in an affidavit attached as an exhibit to the motion for summary judgment.  He confirmed that on May 31, 2017, information was received that suggested there was a gun in 21 barracks.  *Id.*  He stated that the possession of a gun by an inmate is a major breach of security that jeopardizes the safety of staff and inmates.  *Id.*  According to Emsweller, who was present during the March 31, 2017 strip searches, the searches were conducted in accordance with ADC and unit policy.  Doc. No. 61-3 at ¶ 14.  He stated that when time allows and the need is not urgent, inmates are strip searched in a bathroom or other private area.  Doc. No. 61-3 at ¶ 15.  He explained that the possibility of an inmate having a gun in the barracks, however, is an urgent matter that calls for an immediate search to protect the good order and safety of the unit.  *Id.*  He also explained that, due to the urgency of the matter on May 31, 2017 and security concerns, the inmates could not be allowed in the bathroom or other areas and they had to be searched immediately in the hallway outside the barracks.  *Id.*  Emsweller did not remember any female correctional officers being present in the immediate search area.  Doc. No. 61-3 at ¶ 16.  Emsweller also does not remember whether inmates located in the barracks across the hallway from 21 barracks observed the strip search through the window of their barracks.  Doc. No. 61-3 at ¶ 17.  Normally, the inmates housed in the neighboring

---

[5] Holloway claims that a female officer named Spencer was standing behind Emsweller during the search.  Doc. No. 67 at 3.

7

barracks are made to sit on their beds in an attempt to limit their involvement with any ongoing incident.[6] *Id.*

James Gibson also testified in an affidavit attached as an exhibit to the motion for summary judgment.[7] Doc. No. 61-6 at ¶ 6. He stated that strip searches are part of the standard operating procedure when a search for contraband is ordered. *Id.* Gibson stated that he was in and out of the barracks during the May 31, 2017 searches, and the strip searches were conducted in accordance with ADC and unit policy. *Id.* at ¶¶ 12 & 13. Gibson explained that the inmates were cleared out of the barracks and searched in the hallway because there was not enough room in the bathroom/shower area,. *Id.* at ¶ 14. Gibson also testified that he did not recall whether any female correctional officers were present during the strip searches. *Id.* at ¶ 15.

## IV. Discussion

### A.  *Sovereign Immunity*

Phillips correctly asserts that Holloway's monetary claims against him in his official capacity are barred by sovereign immunity. A suit against a defendant in his or her official capacity is in essence a suit against the State of Arkansas, and any official capacity claim for monetary damages against that defendant is barred by the doctrine of sovereign immunity. *Will v. Michigan Department of State Police, et al.*, 491 U.S. 58, 71 (1989)*; Nix v. Norman*, 879 F.2d 429, 431-432 (8th Cir. 1989). Accordingly, the undersigned recommends that Phillips be awarded summary judgment with respect to Holloway's official capacity claims for money damages.

### B.  *Qualified Immunity*

---

[6] Holloway claims he knows the inmates were not sitting on their beds because he could see the inmates looking at the inmates who were being searched. Doc. No. 67 at 3.

[7] In May 2017, James Gibson was the Superintendent at the Varner Unit. Doc. No. 61-6 at ¶ 6.

Phillips argues he is entitled to qualified immunity with respect to Holloway's individual capacity claims. Qualified immunity protects government officials from liability for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person [in their positions] would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). Qualified immunity is a question of law and is appropriately resolved on summary judgment. *McClendon v. Story County Sheriff's Office*, 403 F.3d 510, 515 (8th Cir. 2005); *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). To determine whether a defendant is entitled to qualified immunity, the Court must consider two questions: (1) do the facts alleged by plaintiff establish a violation of a constitutional or statutory right; and (2) if so, was that right clearly established at the time of the defendant's alleged misconduct. *Wright v. United States*, 813 F.3d 689, 695 (8th Cir. 2015). Courts may exercise "their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Prison inmates are protected by the Fourth Amendment against unreasonable searches of their bodies. *See Levine v. Roebuck*, 550 F.3d 684, 687 (8th Cir. 2008). However, body cavity searches may be used as a means of maintaining institutional security in prison facilities and are not necessarily unconstitutional. *See, e.g., Florence v. Board of Chosen Freeholders of County of Burlington*, 132 S. Ct. 1510 (2012); *Goff v. Nix*, 803 F.2d 358 (8th Cir. 1986). Such searches should not be conducted "in a degrading, humiliating or abusive fashion." *Story v. Foote*, 782 F.3d 968, 972-73 (8th Cir. 2015). The Fourth Amendment requires a "balancing of the need for the particular search against the invasion of personal rights that the search entails." *Bell v. Wolfish*, 441 U.S. 520, 559 (1979). "Courts must consider the scope of the particular intrusion, the manner

in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Id.*

It is undisputed that the searches of barracks 21 and the inmates housed there were done because it had been reported that someone in the barracks had a gun. Phillips testified that the inmates were strip searched in the hallway to keep them from passing the gun to each other in order to conceal it. Emsweller also testified that security concerns prevented the inmates from being searched in the bathroom. Gibson testified that there was not enough room to search all of the inmates in the bathroom together. Under these circumstances, it was not unreasonable to conduct the searches in the hallway between barracks as opposed to a bathroom.

The parties dispute whether there were females nearby during the search. Phillips, Emsweller, and Gibson did not recall any females present in the immediate search area. And although Holloway states in his response that a female officer was standing just behind Emsweller during the search, he did not testify to that in his deposition testimony. In his testimony, he stated that female guards in nearby barracks were present and that other females could see from down the hall. Any dispute regarding the proximity of females during the search is immaterial, however, because the "occasional or inadvertent sighting by female guards of nude male inmates does not violate the inmates' limited right of privacy." *Williams v. Bradley*, No. 5:05CV10 BD, 2008 WL 2954247, at *10 (E.D. Ark. July 29, 2008), *aff'd*, 352 F. App'x 133 (8th Cir. 2009). *See also Story v. Foote*, 782 F.3d at 972 ("[T]he male officers did not violate Story's clearly established rights by conducting the inspection in a location where a female officer also may have viewed the search from the master control room through a video feed from a security camera."); *Hill v. McKinley*, 311 F.3d 899, 904-905 (8th Cir. 2002) (holding that a female detainee's "very narrow zone[ ] of privacy" was not violated even though she was made to undress in front of a male guard); *Timm*

10

*v. Gunter,* 917 F.2d 1093, 1102 (8th Cir. 1990) ("Whatever minimal intrusions on an inmate's privacy may result from [opposite-sex] surveillance, whether the inmate is using the bathroom, showering, or sleeping in the nude, are outweighed by institutional concerns for safety and equal employment opportunities").

Likewise, under existing case law, the ability of other inmates to see a strip search does not violate the Fourth Amendment's prohibition on unreasonable searches. *See e.g., Story v. Foote*, 782 F.3d at 972 ("[T]he alleged presence of other inmates during Story's search does not state a claim for the violation of clearly established rights."); *Franklin v. Lockhart*, 883 F.2d 654, 656-57 (8th Cir. 1989) (visual body cavity searches conducted in view of other prisoners upheld absent substantial evidence that it was an exaggerated response to security concerns).

In sum, Holloway cannot show that his clearly established constitutional rights were violated. There is no dispute that a gun had been reported in his barracks, and that no gun was located during searches of the barracks on May 30 and May 31, 2017. Based on the possible presence of a gun among the inmates, it was not unreasonable to conduct the searches in the hallway as opposed to a bathroom. Furthermore, under existing case law, the possibility that some female guards or other inmates could see the searches does not render them unconstitutional. Accordingly, Phillips is entitled to qualified immunity and should be awarded summary judgment on Holloway's individual capacity claims.

C.  *Injunctive Relief*

The undersigned also recommends summary judgment be granted in favor of Phillips with respect to Holloway's claim for injunctive relief. Holloway requests injunctive relief "to prevent this type abuse again" and for proper training of all ADC staff. Doc. No. 20 at 7. Holloway also asks that Phillips be enjoined from harming him or harassing him in any way. *Id.* In his deposition,

Holloway stated that he wanted strip searches conducted in a reasonable manner, not as punishment, and in as private an area as possible. Doc. No. 69 at 27.

Injunctive relief is an extraordinary remedy, particularly in a prison context. *See Goff v. Harper*, 60 F.3d 518 (8th Cir. 1995) (citing *Rogers v. Scurr*, 676 F.2d 1211, 1214 (8th Cir. 1982)). In *Rogers*, the Eighth Circuit Court of Appeals explained that injunctive relief is not appropriate unless it has been proven that a prisoner's constitutional rights were violated and a "cognizable danger of future violation exists" which is more than a mere possibility. 676 F.2d at 1214. In sum, the Eighth Circuit held that courts should not interfere with prison administration "unless either a constitutional violation has already occurred or the threat of such a violation is both real and immediate." *Id.* Because Holloway has not shown that his constitutional rights were violated or that future violations of his rights are likely to occur without the injunctive relief he seeks, summary judgment should be awarded in favor of Phillips as to Holloway's claims for injunctive relief.

## IV.  Conclusion

The undersigned recommends that Phillips' motion for summary judgment (Doc. No. 61) be granted, and that Holloway's claims against Phillips be dismissed with prejudice.

DATED this 9th day of August, 2019.

_____
UNITED STATES MAGISTRATE JUDGE